Lawrence IANETTA, Plaintiff,

v.

PUTNAM INVESTMENTS,
INC., Defendant.

No. CIV.A. 00–10385–JLT.

United States District Court,
D. Massachusetts.

Jan. 29, 2002.

As Amended Feb. 25, 2002.

Matthew Cobb, Law Firm of Matthew Cobb, Boston, MA, for Lawrence Ianetta, Plaintiff.

Ilene Robinson, Sullivan & Worcester, LLP, Boston, MA, for Putnam Investments Incorporated, Defendant.

## *MEMORANDUM*

TAURO, District Judge.

Plaintiff Lawrence Ianetta ("Ianetta") sues Putnam Investments, Inc., alleging sexual harassment and retaliation in violation of Title VII of the Civil Rights Act Of 1964 ("Title VII") [1], and Mass.Gen Laws ch. 151B. Defendant is Putnam Investments, LLC (together with its subsidiary entities, collectively "Putnam").

Defendant now moves for summary judgment.

## BACKGROUND

Plaintiff Ianetta is a former employee of Putnam Investments. Ianetta began working for Putnam in December 1996 as a shareholder service representative in Boston, Massachusetts.[2] Ianetta's job en-

---

1. 42 U.S.C. § 2000e–2(a)(1).

2. Lemire Aff. ¶ 3.

tailed answering telephone inquires from Putnam shareholders and broker dealers about Putnam's products, services, and mutual fund accounts.[3]

In April 1998, Ianetta transferred voluntarily to Putnam's Custody Department ("Custody"), where he began working as a Trade Control Specialist. Ianetta was assigned to report to Angela Patel, then Custody Manager.[4] After transferring, Ianetta initially worked on Putnam's foreign exchange system, where he was responsible for reviewing information on "Crossmar," a third-party vendor's system that records trades that brokers execute on behalf of Putnam client portfolios. Ianetta must then match that information with trade information Putnam had entered into its own computer system.[5] Ianetta's failure to accurately or timely reconcile trade information could result in significant monetary losses for the company.[6]

Patel contends that Ianetta had numerous problems performing his duties. Patel observed that Ianetta frequently failed to reconcile trades in a timely fashion, did not follow through with issues for which he was responsible, and was confrontational, unpleasant, and easily distracted. Patel claims to have discussed Ianetta's work performance with him on a number of occasions.[7] Ianetta has testified that it

was "reasonable to assume" that Patel had occasion to discuss these problems with him, but denied specific recollection of any such concerns.[8]

In September 1998, Gary Sullivan joined Putnam as the Supervisor of International Trade Support and became Ianetta's immediate supervisor.[9] After supervising Ianetta for two months, Sullivan contends that Patel's observations were accurate, and that Ianetta lacked the attention to detail and sense of urgency required by his position. Sullivan claims to have documented a number of Ianetta's performance problems in this time period.[10]

In November 1998, Sullivan and Stephen Marx, Vice President of International Trade Support and Sullivan's Manager, reassigned Ianetta to work solely on hard copy broker confirmations.[11] Marx and Sullivan contend, and Ianetta denies, that because Ianetta's new duties involved paper confirmations, he no longer was required to use the telephone to speak with brokers or to access information via the Crossmar system.[12]

Putnam claims that despite the fact that his new assignment was less complex, Ianetta's performance failed to improve. These performance problems led Sullivan to review Ianetta's new job description with him in late December 1998.[13]

---

3. Ianetta Dep. 23, 27.

4. Ianetta Dep. 33–34.

5. Ianetta Dep. 35, 40–42; Sullivan Dep. 7–8.

6. Marx Aff. ¶ 3.

7. Patel Aff. ¶ 3.

8. Ianetta Dep. 85–86.

9. Ianetta Dep. 47–48; Sullivan Dep. 5–6.

10. Sullivan Dep. 9–16 and Exh. 3–5, 9; Sullivan Aff. ¶ 3.

11. Marx and Sullivan contend that Ianetta agreed to the new assignment. (Marx Aff. ¶ 4; Sullivan Aff. ¶ 4). Ianetta denies not only that he consented to a reassignment, but also that he was reassigned to different work. According to Ianetta, his purported reassignment was merely a change in title that he believes was made for all Custody employees. (Ianetta Dep. 96–97). But according to Defendant, there were no such title changes, and no other Custody employee was affected. (Marx Aff. ¶ 4).

12. Sullivan Aff. ¶ 4.

In Ianetta's 1998 year-end review, he was complimented for his eagerness to advance his career by taking computer courses outside Putnam, for agreeing to work on holidays, presenting a professional image, and maintaining a good attendance record. The review noted, however, that Ianetta failed to meet the department's productivity standard or complete his work in an efficient manner, had trouble focusing on his work when left unsupervised, and occasionally became confrontational with colleagues and outside contacts. Ianetta was given an overall rating of 2.5 out of a possible 5. Under Putnam's rating system, a rating of below 3 means that the individual's performance "inconsistently meets the basic requirements of the job. Performance fell below the acceptable standard in one or more performance categories. Improvement is required in this position."[14] Most of this review was prepared by Patel, Ianetta's supervisor for most of 1998.[15]

Putnam contends that after several more problems, Marx and Sullivan contacted Ellen Natale (now Lemire) in Putnam's Human Resource Department on February 17, 1999.[16] Putnam claims this contact was the culmination of a number of conversations between Sullivan and Natale over the preceding several months.[17] On the following day, Marx sent an email to Natale stating that Ianetta's performance problems warranted discharge.[18] After conferring with Natale, Marx and Sullivan

agreed to place Ianetta on a final written warning, and began preparing the document with Natale's assistance. Sullivan and Marx created a final disciplinary document that they planned to give to Ianetta on February 19, 1999.[19]

Ianetta claims that on two separate occasions Sullivan called him a "faggot," once on February 19, 1999. Ianetta testified that on the morning of February 19, 1999, he was headed towards the bathroom as Sullivan and Marx came out. Ianetta testified that first Sullivan looked at him, called him a "fucking faggot," and then looked at Marx and "smirked."[20]

At 9:08 A.M. on February 19, 1999, Ianetta sent an email to Edward Whalen, then Senior Vice President, Employee Relations and Staffing, stating that "I have specific questions relating to Putnam's policy. Specifically, maintaining 'terms, conditions and privileges of employment in a manner that does not discriminate unlawfully on the basis of ... sexual orientation.'" Ianetta also requested a meeting with Whalen on a date convenient for Ianetta.[21] Whalen responded to Ianetta's email at 9:28 A.M., stating that he was not available on the suggested dates but that Ianetta could meet with Natale. Ianetta replied by email that he preferred to wait and meet with Whalen on February 26.[22]

Late that afternoon, Sullivan and Marx gave Ianetta a final written warning.[23] The warning cataloged Ianetta's alleged

13. Sullivan Depo. 9–16.

14. Ianetta Dep. Exh. 4.

15. Patel Aff. ¶ 4; Sullivan Dep. 44–45.

16. Sullivan Dep. 59–60 and Exh. 12.

17. Sullivan Dep. 59–60; Lemire Aff. ¶ 4.

18. Marx Dep. 15–16; Ianetta Dep. Exh. 2.

19. Sullivan Dep. 55–56, 59–60; Lemire Aff. ¶ 5.

20. Ianetta Dep. 61.

21. Ianetta Dep. 126–127 and Exh. 1.

22. Ianetta Dep. Exh. 5; Whalen Dep. 9.

23. Sullivan Dep. 66.

performance problems over the preceding six months.[24] Ianetta has denied every incident in the warning except two: Ianetta admitted that he surfed the Internet during work hours and that he had reported a computer problem to Putnam's technical support staff in October 1998, although he denied that he erred in leaving before the problem had been resolved.[25]

On February 24, 1999, Ianetta filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") alleging discrimination based on sex and sexual orientation.[26] On February 26, 1999, Ianetta met with Whalen, but did not reveal the MCAD charge.[27] In the meeting, Ianetta told Whalen that he had been denied access to a telephone and a computer for some period of time, that Sullivan had called him a "faggot," that he received a poor year-end review, and that he had been placed on a final warning after sending his email to Whalen on February 19.[28]

Whalen conducted an investigation into Ianetta's complaints, and met with Ianetta to advise him that he had found no evidence to suggest that Ianetta had been treated differently from any other similarly situated employee on account of his sexual orientation.[29] Whalen found that Ianetta was among a group of employees who, due to budgetary constraints, had been without a telephone and/or computer for some period of time, but had been moved into a fully equipped work station as soon as possible with no adverse consequences.[30]

On March 17, 1999, Ianetta was responsible for confirming a block of approximately 50 sell order trades totaling over $5 million on behalf of several Putnam clients. These trades were required to be settled, or confirmed, by March 19. Ianetta processed the trades in Putnam's computer system with a settlement date of March 22. The error was discovered by a Custody supervisor who brought it to Sullivan's attention on March 18. The error was corrected that day and the trades were confirmed. Putnam contends that if the error had not been discovered the trades would have failed, and the clients' accounts would have been overdrawn by $5 million. Ianetta was subsequently discharged on March 23, 1999.[31]

## DISCUSSION

Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[32] When a court decides a motion for summary judgment, it "examines the entire record in the light most flattering to the nonmovant and indulges all reasonable inferences in that party's favor."[33] A party moving for summary judgment bears the initial burden of showing that there are

---

24. Ianetta Dep. Exh. 8.

25. Ianetta Dep. 142–154, 162–168.

26. Ianetta Dep. 127–128, 132–133, 176–177.

27. Whalen Aff. ¶ 3.

28. Ianetta Dep. 181.

29. Whalen Dep. 26, 31–34.

30. Ianetta Dep. Exh. 19.

31. Marx Aff. ¶¶ 6, 7; Sullivan Aff. ¶¶ 10, 11 and Exh. 1.

32. Fed.R.Civ.P. 56(c).

33. *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir.1997) (citations omitted).

no material facts genuinely in dispute, and it is entitled to judgment as a matter of law.[34] When the moving party has done so, the nonmovant "must establish at least a genuine issue of material fact on every element essential to his case in chief."[35] Concurrently, those factual disputes "must herald the existence of 'definite, competent evidence.' "[36] "[O]ptimistic conjecture, unbridled speculation, or hopeful surmise will not suffice."[37]

Because Ianetta bears the burden of persuasion in this Title VII action, Putnam is entitled to summary judgment if it can demonstrate that Ianetta could not carry the burden of proof at trial. Putnam may demonstrate this in two ways: "(1) the defendant may show that the plaintiff has not and will not be able to establish a prima facie case, or (2) if the plaintiff has successfully established a prima facie case, the defendant may win summary judgment by showing that the plaintiff could not produce sufficient evidence of a pretext to rebut an assertion of nondiscriminatory reasons for discharge."[38] But, summary judgment is inappropriate if Ianetta establishes a prima facie case and counters Putnam's proffered explanation with "evidence raising a factual issue regarding the employer's true motivation for discharge."[39]

### A. Discrimination and Harassment

■ To prove discrimination under Title VII, Ianetta must show that he has been discriminated against because of his sex.

He may show sex discrimination in three ways: (1) by providing evidence that the harassment was motivated by sexual desire, (2) by providing evidence that the harassment was motivated by a general hostility toward the presence of one sex in the workplace, or (3) by providing evidence that the harassment was intended to punish the victim for non-compliance with gender stereotypes.[40]

Although the Supreme Court recognized in *Oncale v. Sundowner Offshore Serv., Inc.*, that same sex harassment is prohibited by Title VII, Ianetta has not claimed that sexual advances or propositions were made toward him at any time.

■ In evaluating Ianetta's claim under the second type of discrimination (general hostility toward one sex in the workplace) the record of evidence does not establish a claim that Putnam expressed an animosity toward the male sex in general, in Ianetta's field of employment. The most that is presented by the evidence is that Putnam has an animosity toward homosexuals which amounted to discrimination, but sexual orientation is not protected by Title VII.[41]

The final category under which Ianetta may claim sex discrimination is that of impermissible gender stereotypes. This court has already stated that a complaint based on one's failure to conform to a gender stereotype states a claim for sex

**34.** *See* Fed.R.Civ.P. 56(c).

**35.** *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 479 (1st Cir.1993), *quoting Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991).

**36.** *Vega*, 3 F.3d at 479, *quoting Mesnick*, 950 F.2d at 822; *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

**37.** *Id.*

**38.** *Jalil v. Avdel Corp.*, 873 F.2d 701, 707 (3rd Cir.1989); *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**39.** *Id.*

**40.** *Bibby v. Coca Cola Bottling Company*, 2001 WL 919976 *4 (3rd Cir. Aug. 1, 2001).

**41.** *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir.1999).

discrimination under Title VII.[42] In denying the defendant's motion to dismiss, this court relied on the First Circuit's decision in *Higgins*, which recognized that same-sex harassment is prohibited by Title VII, just as is opposite-sex harassment.[43] The First Circuit further stated that "just as a woman can ground an action on a claim that men discriminated against her because she did not meet stereotyped expectations of femininity, a man can ground a claim on evidence that other men discriminated against him because he did not meet stereotyped expectations of masculinity."[44]

■ Ianetta claims that the term "faggot" is necessarily a stereotypical term and necessarily imports the male gender,[45] a claim which he says is supported by *Oncale* and *Price Waterhouse*. But *Oncale* stated that "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion]...because of...sex'."[46] The Supreme Court has never held that harassment is automatically discrimination because the words used have sexual content or context. As the Court stated, "the critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."[47]

Other circuits have recently examined the issue of sexual orientation and gender stereotyping, specifically, whether the term "faggot" is a stereotypical term or necessarily imports the male gender. In *Bibby v. Coca Cola Bottling Company*, a male employee, John Bibby, was repeatedly harassed by other male co-workers.[48] Bibby presented evidence that he was called "sissy," "faggot," and told "you take it up the ass." But the Third Circuit determined that Bibby had not presented sufficient evidence of discrimination because of a gender stereotype, and thus granted summary judgment. The court also engaged in a lengthy discussion of protection under Title VII, and Congress's repeated refusal to include sexual orientation as a protected class despite numerous attempts to amend the Act.[49]

The Second Circuit undertook the same evaluation in *Simonton v. Runyon*, where the plaintiff was again repeatedly called a "fucking faggot" and told "go fuck yourself fag," "suck my dick" and "so you like it up the ass?"[50] In that case, co-workers placed pornographic photos in his work area, sent him male dolls and a copy of Playgirl magazine, and posted his name in the employee bathroom along with the names of celebrities who had died of AIDS.[51] Simonton argued, much as Ianetta does, that discrimination because of perceived homosexuality falls under *Price Waterhouse*'s "gender stereotype" Title VII coverage. The court disagreed, stating that "alleging harassment or disparate treatment based upon nonconformity with sexual stereotypes is cognizable under Ti-

---

**42.** *Ianetta v. Putnam Investments, Inc.*, 142 F.Supp.2d 131, 133 (D.Mass.2001).

**43.** *See Higgins*, 194 F.3d at 261 n. 4.

**44.** *Id.* (citations omitted).

**45.** Pl's Opp'n to Defs.' Mot. for Summ. J. 10.

**46.** *Oncale v. Sundower Offshore Serv., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

**47.** *Id.*

**48.** *Bibby v. Coca Cola Bottling Company*, 2001 WL 919976 *4 (3rd Cir. Aug. 1, 2001).

**49.** *Id.* at *3.

**50.** *Simonton v. Runyon*, 232 F.3d 33, 35 (2d Cir.2000).

**51.** *Id.*

tle VII as discrimination because of sex." But, the court found that Simonton's theory, that harassment implying homosexuality is also a form of gender stereotype harassment, is not cognizable under Title VII. The court found that the gender stereotype theory articulated in *Price Waterhouse* did not apply to sexual orientation harassment: "This theory would not bootstrap protection for sexual orientation into Title VII because not all homosexual men are stereotypically feminine, and not all heterosexual men are sterotypically masculine."[52] Although Simonton produced substantial evidence of the harassment he endured, the court found that the evidence did not state a claim under Title VII and dismissed the claim. "When interpreting a statute, the role of a court is limited to discerning and adhering to legislative meaning. The law is well-settled in this circuit and in all others to have reached the question that Simonton has no cause of action under Title VII because Title VII does not prohibit harassment or discrimination because of sexual orientation."[53] The court stated, "We do not have sufficient allegations before us to decide Simonton's claims based on stereotyping because we have no basis in the record to surmise that Simonton behaved in a stereotypically feminine manner and that the harassment he endured was, in fact, based on his non-conformity with gender norms instead of his sexual orientation."[54]

The Seventh Circuit reviewed the issue in three cases, again with a plaintiff alleging that slurs such as "gay," "faggot," and "bitch" were in and of themselves gender stereotypes.[55] In *Spearman v. Ford Motor Co.*, the court held that the relevant test is to "consider any sexually explicit language or stereotypical statements within the context of all the evidence of harassment in the case, and then determine whether the evidence as a whole creates a reasonable inference that the plaintiff was discriminated against because of his sex."[56] The insults cast at these plaintiffs only confirm that they were harassed because of hostility toward their sexual orientation, and not to their sex: "Here, the record clearly demonstrates that Spearman's problems resulted from his altercations with co-workers over work issues, and because of his apparent homosexuality. But he was not harassed because of his sex."[57] The Seventh Circuit has found that the only reasonable inference that can be drawn from these, and similar comments, is that the defendants possessed a discriminatory animus towards the plaintiff's sexual orientation.[58]

In denying Defendant's motion to dismiss for failure to state a claim, this court stated that an allegation of discrimination for failing to meet the male gender stereotype states a claim for sex discrimination under Title VII.[59] Following precedent, this court allowed the claim to survive, as a claim for relief need only be, "a short and

52. *Id.* at 38.

53. *Id.* at 35.

54. *Id.* at 38.

55. *See Spearman v. Ford Motor Co.*, 231 F.3d 1080 (7th Cir.2000); *See also Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701 (7th Cir.2000); *See also Dandan v. Radisson Hotel Lisle*, 2000 WL 336528 (N.D.Ill. March 28, 2000).

56. *Spearman*, 231 F.3d at 1085.

57. *Id.*

58. *See Dandan v. Radisson Hotel Lisle*, 2000 WL 336528 (N.D.Ill. March 28, 2000).

59. *Ianetta*, 142 F.Supp.2d at 134.

plain statement of the claim showing that the pleader is entitled to relief." [60] Ianetta stated a claim for which relief could be granted, therefore, by claiming that he was discriminated against on account of his sex, and he was not required to put forth evidence to substantiate this claim.

■ But to survive a motion for summary judgment under Federal Rule of Civil Procedure 56, however, Ianetta must produce sufficient evidence to support each and every element of his claim. Despite extensive discovery, Ianetta failed to produce sufficient evidence to support his claim that he was discriminated against because of his sex. The evidence, taken in light most favorable to the plaintiff, provides two instances in which Ianetta was called a "faggot." As stated by the First Circuit, "we are called upon here to construe a statute as glossed by the Supreme Court, not to make a moral judgment— and we regard it as settled law that, as drafted and authoritatively construed, Title VII does not proscribe harassment simply because of sexual orientation." [61] Ianetta has not produced the necessary evidentiary base for this court to find he was harassed because of his sex.

Summary judgement on Ianetta's claims of sexual discrimination and sexual harassment under Title VII of the Civil Rights Act of 1964 is therefore appropriate.

### B. Retaliation

Title VII prohibits employers from discriminating against any employee "because he has opposed any practice made unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." [62]

In Count I of his Second Amended Complaint, Ianetta claims that he was retaliated against by Putnam in two ways: first, by giving him a final written warning after he complained of discrimination in his February 19 email to Whalen, and second, by discharging him a month after he filed his charge with the MCAD. [63]

■ To succeed on a claim of retaliation, Ianetta must first establish a prima facie case that (1) he engaged in a protected activity as an employee, (2) he subsequently suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the discharge. [64]

■ This court, in its denial of Putnam's motion to dismiss, has already addressed Ianetta's first claim of retaliation. [65] Ianetta has not produced sufficient evidence to support a claim that his February 19, 1999 email was a complaint founded on anything more than sexual orientation. As sexual orientation is not protected under Title VII, Ianetta's email to Whalen was not a protected activity. The first claim of retaliation, therefore, is without merit and will not be further addressed.

■ Ianetta has alleged retaliation not only based upon his email, but also for

---

**60.** Fed R. Civ. P. 8(a)(2).

**61.** *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 259 (1st Cir.1999) (citations omitted).

**62.** 42 U.S.C. § 2000e–3.

**63.** Compl. ¶¶ 31–35.

**64.** *See Hoeppner v. Crotched Mountain Rehab. Ctr.,* 31 F.3d 9, 14 (1st Cir.1994); *See also Hazel v. United States Postmaster Gen.,* 7 F.3d 1, 3 (1st Cir.1993).

**65.** *Ianetta v. Putnam Investments, Inc.,* 142 F.Supp.2d 131, 135 (D.Mass.2001).

filing a MCAD complaint.[66] As this court previously stated, Ianetta raised both sexual orientation and gender discrimination in his MCAD complaint. Because gender discrimination is prohibited by Title VII, Ianetta's MCAD filing is a protected activity,[67] and this court must now determine if Ianetta has provided sufficient evidence to establish a prima facie case of retaliation under Title VII.

In its motion for summary judgment, Putnam assumes that Ianetta met his prima facie burden on this portion of his claim.[68] The evidence produced (the MCAD filing was a protected activity, he was subsequently terminated, and there exits an inference of a causal connection between the protected activity and the discharge) is sufficient for this court to proceed as if Ianetta has established a prima facie case of retaliation.

Once a prima facie case of retaliation has been established, the court must then review the evidence under the standard laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green.*[69] In what has become commonly know as burden shifting analysis, Putnam must counter Ianetta's elemental showing by providing the court with evidence of a legitimate, non-retaliatory reason for Ianetta's termination.[70] If this burden is met by Putnam, Ianetta must provide evidence that Put-

nam's reason for termination was a pretext, and that the true reason was a retaliatory motive.[71]

This court finds that even though Ianetta has established a prima facie case of retaliation, Putnam has articulated a legitimate nondiscriminatory reason for terminating him.

■ Putnam has presented evidence not only that Ianetta was repeatedly warned about careless errors and issued a final written warning because of these errors, but also that his discharge came immediately after he entered the wrong date for confirmation on a block of fifty trades, actions which Putnam contends could have exposed it to significant liability. Putnam has submitted evidence that Ianetta's performance in Custody was below par, in any event, lower than the performance of all similarly situated Custody employees.[72] For present purposes, Putnam has sufficiently articulated a legitimate reason for its adverse action against Ianetta.

The competing considerations that underlie a pretext analysis are especially problematic in a case like Ianetta's. Under the *McDonnell Douglas* framework, in order to rebut the presumption that arises upon the establishment of a prima facie case, the employer need only produce enough competent evidence that would

---

66. Compl. ¶ 24.

67. *Ianetta,* 142 F.Supp.2d at 135 (citations omitted).

68. Defs.' Mot. for Summ. J. 18–19.

69. 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *See Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 107 (1st Cir. 1988).

70. *See McMillian v. Massachusetts S.P.C.A.,* 140 F.3d 288, 309 (1st Cir.1998).

71. *Id.*

72. Ianetta contends that his sub-par 1998 year end evaluation was tainted by Sullivan's discriminatory animus, and the final written warning was made in consideration of his February 19, 1999 email. On the first count, Ianetta has failed to address the evidence that his evaluation was prepared primarily by Patel, and as previously stated, discrimination on the basis of sexual orientation is not protected by Title VII. On the second count, as this court has addressed above, his email is not a protected activity under Title VII and will not be considered in this evaluation.

permit a rational fact finder to conclude that the challenged employment action was taken for a "legitimate, nondiscriminatory reason."[73] Putnam has accomplished this by offering testimony of its decision-making supervisors that Putnam discharged Ianetta because of his performance, and that its decision ignored his protected MCAD filing. Ianetta must demonstrate that there is a trialworthy issue of pretext.

■ When a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be "particularly cautious" about granting an employer's motion for summary judgment.[74] But summary judgment is not "automatically precluded" even in cases where elusive concepts such as motive or intent are at issue.[75] "If the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation," summary judgment may be appropriate even when intent is an issue.[76]

■ The nonmoving plaintiff may demonstrate pretext either by indirectly showing that the employer's stated reasons for its adverse actions were not credible, or by directly showing that the action was more likely motivated by a discriminatory reason.[77] One way an employee may succeed, therefore, is to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and [with or without additional evidence and inferences properly drawn therefrom] infer that the employer did not act for the asserted non-discriminatory reasons."[78]

Applying these principles, this court must determine whether there is sufficient evidence favoring Ianetta for "a fair-minded jury [to] return a verdict in his favor."[79] There must be sufficient evidence for a jury to conclude that Ianetta's discharge was motivated by retaliation for his availment of a right protected by Title VII, namely, the right to file a sex discrimination charge with MCAD. This court has already determined that Ianetta has produced sufficient evidence to satisfy the "low threshold" required to meet his prima facie case.[80] Because Putnam has met Ianetta's prima facie case by articulating its facially nondiscriminatory reasons for terminating him, this court must now examine whether Ianetta has produced sufficient evidence for a rational jury to conclude those reasons were a pretext for discrimination.

Based on the record here, it does not appear that a rational jury could reach such a conclusion. It is undisputed that a number of Ianetta's problems on the job took place long before he filed his MCAD

**73.** *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 166 (1st Cir.1998) (internal citations and quotations omitted).

**74.** *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983).

**75.** *See DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997) (internal citations and quotations omitted).

**76.** *Id.*

**77.** *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**78.** *Morgan v. Hilti Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997) (internal quotations omitted).

**79.** *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**80.** *Hodgens*, 144 F.3d at 169.

charge. For example, Ianetta had been consulted about performance problems before Sullivan arrived at Putnam, and more than a year before he filed his MCAD charge, he was reassigned to hard copy broker confirmations because of a lack of attention to detail. Even after Ianetta was reassigned, his performance continued to lag, as was indicated by his 1998 year-end evaluation. Finally, Ianetta was issued a final written warning for continued performance problems. All of the foregoing events, putting Ianetta in an extremely unfavorable position at work, occurred prior to his filing a MCAD charge.

In order to overcome the weight of these facts, Ianetta offers evidence intended to dispute the legitimacy of Putnam's rationale for discharging him, and expose that rationale as a mere pretext. Ianetta's claims of sex discrimination are not protected activities, and thus cannot be considered as evidence of a pretext. As discussed above, Ianetta's claim of a pretext rests solely on the fact that the filing of his MCAD charge is a protected activity, and his discharge was subsequent to his filing of this charge. The only evidence that Ianetta can present of a pretext, therefore, would go toward the temporal proximity between his filing and his termination.

Ianetta insists that temporal proximity between two events may give rise to an inference of causal connection,[81] therefore, "it may be significant that [Ianetta's termi-

nation occurred] shortly after his having [filed his MCAD charge]."[82] While Ianetta is correct that temporal proximity may give rise to a "suggest[ion] of retaliation,"[83] that "suggest[ion]" is not necessarily conclusive. It is the employee's burden to show pretext sufficient to survive summary judgment.

The question of summary judgment here is a close one because both Putnam and Ianetta have presented probative evidence tending to support their respective versions of the facts regarding whether Putnam's reason for discharging Ianetta was legitimate or merely a pretext to retaliate against him for filing his MCAD charge. The weighing of such alternative factual scenarios would ordinarily be left to the finder of fact after trial. But on this record, the weight of the evidence does not "present a sufficient disagreement to require submission to a jury."[84] The evidence is "so one-sided that one party must prevail as a matter of law."[85]

No rational factfinder could reasonably conclude that Putnam terminated Ianetta in retaliation for exercising his rights under the statute, as the vast majority of Putnam's legitimate reasons for termination came before he filed his MCAD charge. It is settled law that if an employer has set a course of action regarding employee discipline, it need not change that course of action because a Title VII claim has been made against it.[86] Over-

---

**81.** *Marx v. Schnuck Markets, Inc.,* 76 F.3d 324, 329 (10th Cir.), *cert. denied,* 518 U.S. 1019, 116 S.Ct. 2552, 135 L.Ed.2d 1071 (1996).

**82.** *Williams v. Shenango, Inc.,* 986 F.Supp. 309, 322 (W.D.Pa.1997) (denying summary judgment for an employer because a reasonable factfinder could find an employer's articulated reasons for suspending and terminating employee to be pretexts for discrimination based on a protected action).

**83.** *Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 110 (1st Cir.1988).

**84.** *Anderson,* 477 U.S. at 251–252, 106 S.Ct. 2505.

**85.** *Id.*

**86.** *Clark County School District v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed,

whelming evidence demonstrates Ianetta's poor performance (uncontested by any counter evidence), during his two plus years prior to his protected MCAD filing. The evidence Ianetta offered is simply insufficient to allow a factfinder to infer intent. Because "a fair-minded jury could [not] return a verdict for [Ianetta] on the evidence presented," [87] summary judgment is appropriate.

### CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is ALLOWED with respect to Count I of the Complaint,[88] and the case is DISMISSED. AN ORDER WILL ISSUE.

and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence of causality.").

87. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

88. Having granted summary judgment on Count I of Plaintiff's complaint, this court no longer has jurisdiction over Count II, Ianetta's sexual orientation discrimination claim. Count II is therefore dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).