**Michael HAMM, Plaintiff,**

v.

**WEYAUWEGA MILK PRODUCTS, INC., Defendant.**

**No. 00–C–1283.**

United States District Court, E.D. Wisconsin.

May 9, 2002.

Ryan M. Benson, Stevens Point, WI, for Plaintiff.

Lauri D. Morris, Madison, WI, for Defendant.

### DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CALLAHAN, United States Magistrate Judge.

## I. PROCEDURAL BACKGROUND

In this action, filed on September 22, 2000, the plaintiff, Michael Hamm

("Hamm"), alleges that the defendant, Weyauwega Milk Products, Inc. ("Weyauwega"), discriminated against him on the basis of his sex, creating a hostile work environment, and retaliated against him, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

Currently pending before the court is defendant Weyauwega's motion for summary judgment filed pursuant to Federal Rule of Civil Procedure 56, alleging that there are no issues of material fact to be resolved and that judgment as a matter of law should be granted in its favor. Hamm filed a response in opposition to Weyauwega's motion for summary judgment. Subsequently, Weyauwega filed a reply. Weyauwega was also given leave by the court to file a supplemental brief in support of its motion for summary judgment, including two additional proposed findings of fact.

This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, federal question jurisdiction. Venue in the Eastern District of Wisconsin is proper pursuant to 28 U.S.C. § 1391. All parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General L.R. 73.1 (E.D.Wis.). The defendant's motion for summary judgment is fully briefed and ready for resolution. For the reasons which follow, Weyauwega's motion for summary judgment will be granted.

## II. FACTUAL BACKGROUND

In support of its motion for summary judgment, the defendant filed a set of proposed findings of fact ("DPFOF"). The plaintiff subsequently submitted his own proposed findings of fact ("PPFOF") and was allowed, by leave of court, to file a late response to the defendant's proposed findings of fact ("Pl.'s Resp. to DPFOF"). The defendant then filed responses to the plaintiff's proposed findings of fact ("Def.'s Resp. to PPFOF") and was permitted, by leave of court, to file additional proposed findings of fact ("Def.'s Add'l PFOF"). A review of those submissions reveals the following to be the material, undisputed (unless otherwise indicated) facts in this case.

Plaintiff Michael Hamm was employed by Weyauwega from July 1992 until July 1999. (DPFOF ¶ 1; PPFOF ¶ 6.) Hamm held numerous positions during his employment with Weyauwega, which employs approximately 170 people. (DPFOF ¶ 2; PPFOF ¶ 80.) The Weyauwega plant was almost exclusively male; no women worked in the 640 room, the whey department, or in intake, which are all areas of the plant where Hamm worked and encountered difficulties with his coworkers. (DPFOF ¶ 88.) Although there were others, Hamm alleges that the two coworkers who harassed him most frequently were Dean Bohringer and Fred Kivisto. (PPFOF ¶ 14.)

On January 15, 1998, Hamm filed his first written complaint with Weyauwega detailing incidents during which one of Hamm's coworkers, Dean Bohringer ("Bohringer"), threatened Hamm. (Pl's Resp. to DPFOF ¶ 11.) Specifically, Hamm reported that Bohringer threatened that if Hamm did not do his job correctly he would "kick [Hamm's] ass to make [Hamm] do so." (DPFOF ¶ 12.) Hamm also reported an incident in the break room during which Bohringer threw open the break room door, "started cursing and swearing at him" for failing to replace the empty barrel of foam clean, and subsequently threw a chemical barrel,[1] "bitching and screaming how [Hamm] was a worthless piece of shit and [Hamm] should quit." (DPFOF ¶ 13; Pl's Resp. to DPFOF ¶ 13.) Hamm acknowledged that he yelled back

---

1. The parties dispute whether the barrel was thrown directly at Hamm or across the room.

at Bohringer during the incident. (DPFOF ¶ 14.) Hamm alleged that, during a third incident, Bohringer blew up at Hamm because Bohringer believed that Hamm was screwing up equipment and was not working quickly enough. (DPFOF ¶ 15.) In response to Hamm's complaint, Weyauwega subsequently instructed Bohringer to "cut down on his swearing when he is mad" and asked Hamm to reduce the amount of time he visited with other employees and to follow plant procedures more closely, which both employees agreed to do. (DPFOF ¶¶ 17, 18.)

During the summer of 1998, following Hamm's first complaint to Weyauwega, Weyauwega managers documented a number of errors made by Hamm in performing his work duties, including punching in early (June 20, 1998), failing to wash the recon tank (July 16, 1998), damaging a milk truck by backing it into a beam and driving trucks too fast (August 12, 1998.) (DPFOF ¶ 29.) Additionally, on August 14, 1998, one of Hamm's supervisors, Darwin Handschke ("Handschke"), reported that he had observed Hamm spending too much time talking with his co-worker, Jeff Zietlow ("Zietlow"), specifically that he saw Hamm talking to Zietlow three times within about one hour and that Hamm left as soon as he saw Handschke. (DPFOF ¶ 20.) Handschke also noted that Hamm failed to complete his job prior to leaving for the day on August 15, 1998. (DPFOF ¶ 21.) Above all, one of Hamm's coworkers, Michael Roemer ("Roemer"), wrote a letter to management dated August 14, 1998, detailing the "games" he perceived that Hamm played during work time and relating incidents of horseplay involving missing time cards, games with Roemer's can of soup, dirty underwear in Roemer's locker, and Hamm's use of chemicals to clean the lunchroom tables while Roemer was trying to eat lunch. (DPFOF ¶¶ 22, 23.) Roemer concluded his letter by expressing his suspicion that Hamm was involved in much of the horseplay that occurred in the plant. (DPFOF ¶ 24.)

Weyauwega subsequently gave Hamm a final written warning letter on August 18, 1998, instructing Hamm (1) to stop the horseplay in which he was involved, (2) to stop talking with Zietlow other than for job-related activities, and (3) to cooperate with fellow employees and act as a team player. (DPFOF ¶ 25.) The letter concluded: "If you fail to change your ways to improve, or if we have any complaints about *any* horseplay, or pranks taking place, or if you are seen talking with Jeff Zietlow in any production areas or the intake while on duty and punched in for work and this is non-work related, we will have no choice but to terminate your employment from Weyauwega Milk Products, Inc." (DPFOF ¶ 26.)

After receiving the final written warning letter, on August 20, 1998, Hamm filed a complaint with the City of Weyauwega Police Department[2] regarding incidents at work, reporting to Chief Larry Strauss that he was being verbally abused at Weyauwega, that coworkers were picking on him, yelling at him, complaining that he was not doing his job, and turning his machines off and on. (DPFOF ¶ 41.)

Hamm also filed initial charges with the Wisconsin Equal Rights Division ("ERD") on September 3, 1998 regarding his claims of sexual harassment and retaliation. (PPFOF ¶ 1.) Hamm stated that the "basis" for the ERD complaint was "sex/male-

2. The evidence shows that Hamm and Zietlow also filed a number of complaints against each other with the police department and the courts relating to disputes over property, alleged threats, alleged battery, and alleged underage drinking that are not material to this action. (*See* DPFOF ¶¶ 44, 46, 47, 48.)

hertosexual [sic] Marital Status—single." (PPFOF ¶ 40.) In the charges filed with the ERD, Hamm alleged, among other things, that he had "faggot" written on his locker, that he was called a faggot, bisexual, and Girl Scout[3] by Bohringer, that he had "been threatened to be killed, have [his] neck snapped, [and] had things thrown at [him]" by Bohringer, and that when he brought these incidents to management's attention he was given a final written warning for talking to Zietlow, "a person also perceived as gay by that certain individual." (DPFOF ¶ 27.) Hamm also stated that he believed he was retaliated against "for telling the office of [Bohringer] screaming and yelling at me referring to me as gay, faggot, Girl Scout and bisexual and always threatening to harm my body and mind." (DPFOF ¶ 28.)

Although the timing is unclear, it is uncontradicted that there was a rumor circulating at the Weyauwega plant that Hamm and Zietlow were lovers and that employees believed that there was something funny about Hamm's relationship with Zietlow. (DPFOF ¶ 50; Pl.'s Resp. to DPFOF ¶ 50; DPFOF ¶ 52; *see* PPFOF ¶ 9 (stating that co-workers thought Zietlow and Hamm had a homosexual relationship).) Weyauwega employees thought it odd for Hamm to buy presents for Zietlow, including a four-wheeler about which a dispute over ownership subsequently arose. (DPFOF ¶¶ 47, 53.) Additionally, Hamm's coworkers questioned him about whether he had a girlfriend and why he was not married. (PPFOF ¶ 8.)

To address the issues raised by Hamm in his complaints, Weyauwega set up a meeting for October 5, 1998 between Weyauwega's Vice President, Richard Wagner ("Wagner"), Weyauwega's MIS & Human Resources Director, Don Kallas ("Kallas"), Weyauwega's Plant Manager, Dan Stearns ("Stearns"), Bohringer and Hamm. (DPFOF ¶ 31; PPFOF ¶ 47.) At the meeting, Bohringer apologized to Hamm for getting angry and swearing at him and Hamm agreed to focus on performing his job correctly. (DPFOF ¶¶ 32, 33.) Hamm then requested that Bohringer apologize to Zietlow as well. (DPFOF ¶ 34.) When Zietlow was subsequently called into the meeting, Bohringer apologized to him. (DPFOF ¶ 34.) Kallas placed a call to the ERD at the end of the meeting and requested a form for Hamm to withdraw his complaint. (DPFOF ¶ 35; Pl.'s Resp. to DPFOF ¶ 35.) Kallas then handed the phone to Hamm who indicated to the ERD that he had decided to withdraw the complaint. (Pl.'s Resp. to DPFOF ¶ 35.) Hamm later contacted the ERD stating that he had decided not to withdraw the complaint. (Pl.'s Resp. to DPFOF ¶ 35; PPFOF ¶ 49.)

On October 13, 1998, Weyauwega wrote Hamm a letter agreeing to rescind the final written warning that Hamm had received in August 1998. (DPFOF ¶ 38.) And Hamm wrote a letter to the ERD on or about October 19, 1998, stating the he had decided not to withdraw his complaint and that he wanted his complaint investigated. (DPFOF ¶ 39.)

Hamm experienced additional problems with coworkers in early 1999. In late January or early February of 1999, Hamm called the police department to report damage to his vehicle while it was parked in Weyauwega's parking lot and indicated that he believed that Zietlow had scratched his vehicle. (DPFOF ¶ 45.) Apparently, another of Hamm's coworkers, Frank Young ("Young"), told Hamm something to the effect of "I'll shove the water hose up your ass" after he was hit by Hamm with a full blast of water from a

---

3. Dan Stearns, Weyauwega's plant manager, testified that Bohringer had also used the term "girl scout" when referring to him. (DPFOF ¶ 89.)

hose. (DPFOF ¶96; Pl.'s Resp. to DPFOF ¶96.)

Hamm also filed a written complaint with Weyauwega on March 24, 1999, claiming that a coworker, Fred Kivisto ("Kivisto"), accused Hamm of "looking out of the corner of [his] eyes" at Kivisto and that Kivisto had threatened Hamm with a pipe. (DPFOF ¶56.) Hamm reported that Kivisto told him and coworkers that Hamm was a homosexual and not to bend over near Hamm. (DPFOF ¶57.) Kivisto testified at his deposition that he told Hamm not to "be sizing [him] up." (DPFOF ¶58.) Weyauwega warned Kivisto not to call Hamm names. (DPFOF ¶60.)

Hamm filed another written complaint with Weyauwega on approximately May 25, 1999, claiming that a coworker, Mike Fischer ("Fischer") was following him around. Kirsten Slocum ("Slocum"), Weyauwega's new Human Resource Manager,[4] met with Hamm regarding his May 25, 1999 complaint on May 27, 1999. (DPFOF ¶62; PPFOF ¶52.) Hamm told Slocum, among other things, that Bohringer was trying to get him fired, that Fischer and Bohringer should be fired, that another employee had quit because of Fischer, that Handschke should not be a supervisor, that Zietlow was also harassed and called a "faggot" by Bohringer and that Zietlow had damaged Hamm's car. (DPFOF ¶63.) At the meeting between Slocum and Hamm, Weyauwega alleges that when Slocum asked Hamm how he would resolve the situation, he responded by stating that he did not want to work at Weyauwega and that she should "remove the problem himself." (DPFOF ¶65.) Hamm agrees that management made him feel like he was the problem, but denies he made this statement and affirmatively alleges that he wanted to work and to be scheduled to work at Weyauwega. (Pl.'s Resp. to DPFOF ¶65.)

Slocum subsequently met with the employees, including Bohringer, Fischer, Handschke, Dan Stelzner and Doug Stelzner, whom Hamm alleged were harassing him. (DPFOF ¶66; PPFOF ¶53.) The employees with whom Slocum spoke reported that Hamm tried to blame others for his mistakes, appeared to engage in acts in an attempt to make coworkers angry, left his work undone or did not complete tasks, was frequently standing around talking, and was regarded as having a knack for making things go wrong around the workplace. (DPFOF ¶67.) Hamm's coworkers also reported that Hamm was a regular instigator of problems and rumors at the plant. (DPFOF ¶69.) Specifically, Bohringer reported to Slocum that he thought Hamm frequently made mistakes because Hamm talked too much, fell behind in his work, and then rushed to catch up. (DPFOF ¶70.) Bohringer also told Slocum that he believed either Zietlow or Hamm had placed a sign in his work area stating "Why don't you do your job you 1—lung loser." (DPFOF ¶70.) Some of Hamm's coworkers did not believe that Hamm accurately reported incidents to management and were frustrated with having to go to the human resources office frequently to explain their side of the story. (DPFOF ¶90; Pl.'s Resp. to DPFOF.)

Hamm filed an additional written complaint with Weyauwega on June 7, 1999, claiming that Bohringer swore at him by calling him a "stupid motherfucker" and that Kivisto told coworkers not to bend over in front of him. (DPFOF ¶71; Pl's Resp. to DPFOF ¶71; PPFOF ¶54.) Slocum again investigated the complaint by

4. Kirsten Slocum took over the position of human resource manager from Kallas at the end of May 1999. (PPFOF ¶51.)

speaking with Handschke, Bohringer, and Kivisto. (DPFOF ¶ 72.) Handschke told Slocum that work was behind in the plant because of damage to equipment caused by Hamm and that Bohringer was struggling to correct the problems. (DPFOF ¶ 74.) Additionally, Bohringer denied ever calling Hamm a "stupid motherfucker." (DPFOF ¶ 73.) Therefore, Slocum concluded that Bohringer never swore at Hamm. (DPFOF ¶ 73.) When speaking to Slocum, Kivisto denied having spoken to Hamm at all after Hamm's March 24, 1999 complaint and Weyauwega's warning to him. (DPFOF ¶ 75.) At his deposition, Kivisto testified that he gets a "funny feeling around [Hamm]" (DPFOF ¶ 91) and that he "caught [Hamm] looking at [his] ass," subsequently telling Hamm not to "be sizing [him] up" (DPFOF ¶ 92). Kivisto also stated that he thought it was very likely that Hamm was a homosexual and that he called Hamm a "fairy" or a "queer" because of his belief that Hamm might be a homosexual. (DPFOF ¶ 93.)

Slocum offered Hamm a severance package on June 14, 1999, which Hamm did not accept. (DPFOF ¶ 77; PPFOF ¶ 58.) Weyauwega claims that Hamm, after seeking legal counsel, negotiated an increase in severance pay to seven weeks on June 15, 1999 and told Slocum he would accept the revised severance agreement, subject to review by legal counsel. (DPFOF ¶ 77; Def.'s Resp. to PPFOF ¶ 61.) Hamm disagrees with this characterization of the events, stating instead that on July 15, 1999, Weyauwega offered him a second severance agreement containing more beneficial terms which he never accepted and never reviewed with counsel. (Pl.'s Resp. to DPFOF ¶ 77; PPFOF ¶¶ 59, 61.)

Slocum subsequently conducted an exit interview with Hamm, during which time termination paperwork, such as COBRA and 401–K documents, was completed. (DPFOF ¶ 78; PPFOF ¶ 56.) On that same day, Hamm cleaned out his locker, although the Hamm disputes that he did so voluntarily and claims that Slocum escorted him to his locker. (DPFOF ¶ 78; Pl.'s Resp. to DPFOF ¶ 78; PPFOF 55.) Additionally, on June 14, 1999, Weyauwega terminated Hamm's retirement account with M & I Bank. (PPFOF ¶ 57; Def.'s Resp. to PPFOF ¶ 57.)

Hamm met with Slocum again on June 18, 1999 and stated that he was not accepting or declining the severance agreement. (DPFOF ¶ 79; PPFOF ¶ 63.) Slocum refused to tell Hamm what would happen if he declined the severance agreement. (Pl.'s Resp. to DPFOF ¶ 79; PPFOF ¶ 63.) Hamm then telephoned Slocum during the week of June 21, 1999 to see if he had been scheduled for work but repeated that he was not accepting or declining the agreement. (DPFOF ¶ 80.) Slocum told Hamm that she could not give him an answer but instead told him that she would have to talk to her supervisor or his supervisor to see how to proceed. (PPFOF ¶ 64.) Weyauwega did not schedule Hamm for work or ask him to work after June 29, 1999. (PPFOF ¶ 66; PPFOF ¶ 73; Def.'s Resp. to PPFOF ¶ 73.)

Hamm filed for Unemployment Compensation after the June 18, 1999 meeting because he thought Weyauwega had terminated him. (PPFOF ¶ 70.) Slocum responded to Hamm's Unemployment Compensation claim by stating that Hamm had not been discharged by Weyauwega. (DPFOF ¶ 83; Pl.'s Resp. to DPFOF ¶ 83; PPFOF ¶ 71.) Douglas Simon ("Simon"), Slocum's boss, stated that Weyauwega had made the decision after the severance agreement was offered that, if Hamm did not accept the severance package, Weyauwega would terminate Hamm. (PPFOF ¶ 62.) At the time the first severance agreement was offered, however, Weyauwega had no "plan in place" in the event

Hamm did not accept it. (Def.'s Resp. to PPFOF ¶ 62.) After several days had passed since the June 14, 1999 offer of a severance agreement, Slocum testified that "we had heard comments from other employees out in the plant that things had done a one-eighty. People were very happy that Mr. Hamm was no longer in the workplace. I had heard from one of our managers that the morale had gone sky high, that people were back to doing their jobs, not having to worry about horseplay in the workplace, people were happy that he was no longer there." (Def.'s Resp. to PPFOF ¶ 69.)

Slocum sent a letter to Hamm on July 7, 1999, informing him that, based on his actions indicating that he no longer regarded himself as an employee, Weyauwega regarded him as a quit, effective July 1, 1999. (DPFOF ¶ 83; PPFOF ¶ 67.) The letter also offered Hamm the option of accepting a separate severance agreement, increasing the offer of severance pay from seven weeks of pay to twelve weeks of pay. (Def.'s Resp. to PPFOF ¶ 67.)

Hamm filed a second discrimination complaint with the Wisconsin ERD in June of 1999, which was sent to Weyauwega by a letter dated June 30, 1999, claiming retaliation by co-workers for Hamm's having filed an ERD complaint. (DPFOF ¶ 85.) Hamm alleged in the complaint: (1) that a coworker, Carl Wodrich, complained that Hamm was not being disciplined because Hamm had filed a complaint; (2) that Mike Fischer "made up a story I was not doing my job;" (3) that "Carl and Mike Fischer continue to threaten me because they are mad about me filing a complaint;" (4) that "In April of 1999 Fred Kivisto threatened to hit me with a pipe because he felt I was looking at his nuts and ass;" (5) "I informed management with a written complaint, Dan Stearns informed me that they thought I was 'that way' because they had reason to believe Jeff Zietlow might be

'that way.' "; (6) "On May 4 [1999] Mike Fischer kept shutting my machinery off and on trying to get something to go wrong;" (7) "On May 23 [1999] Mike Fischer threatened I would be getting fired followed me around and harassing me I was not doing my job;" (8) "Also on May 23 [1999] Dean Bohringer stated I was a worthless piece of human flesh and later on shoved me or purposely ran into me in hallway;" and finally (9) that Richard Wagner told Hamm that he was very disappointed in him for not withdrawing his earlier ERD complaint. (DPFOF ¶ 85; Pl.'s Resp. to DPFOF ¶ 85.) Hamm filed a third complaint with the Wisconsin ERD on July 9, 1999.

## III. ANALYSIS

### A. Standard on Motion for Summary Judgment

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed.R.Civ.P. 56(e) advisory committee's notes (*quoted in Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "The standard governing summary judgment is clear: '[I]f no rational jury could, on the evidence presented in the summary judgment proceeding, bring in a verdict for the party opposing summary judgment ... then summary judgment *must* be granted.' " *Oates v. Discovery Zone*, 116 F.3d 1161, 1175 (7th Cir.1997) (quoting *Visser v.*

*Packer Eng'g Assoc., Inc.*, 924 F.2d 655, 660 (7th Cir.1991)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Reid v. Norfolk & Western Ry. Co.*, 157 F.3d 1106, 1110 (7th Cir.1998). "To state it differently, a party will be successful in opposing a summary judgment motion only when they present definite, competent evidence to rebut the motion." *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir.1997) (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See DiGiore v. Ryan*, 172 F.3d 454, 460 (7th Cir.1999). " 'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.' " *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir.1999) (quoting *Severn*, 129 F.3d at 425). However, neither "the mere existence of *some* alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), nor the existence of "some metaphysical doubt

as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), is sufficient to defeat such a motion. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 981–82 (7th Cir.1999).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

**B. Hostile work environment sexual harassment**

Hamm alleges that he was subjected to a hostile work environment because of harassment based on sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms or privileges of employment, because of such individual's ... sex ...." 42 U.S.C. § 2000e–2(a)(1). Thus, an employer violates Title VII if " 'discrimination based on sex ... create[s] a hostile or abusive work environment.' " *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir.1998) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

To establish a hostile environment sexual harassment claim, the plaintiff must first show that the harassment occurred because of sex. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78–81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir.2000); *see also EEOC v. Trugreen Ltd. P'ship*, 122

F.Supp.2d 986, 989 (1999) ("Like the Supreme Court, the Seventh Circuit has emphasized the importance of proving that discriminatory conduct is motivated by the victim's gender.") (citing *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir.1996)). The plaintiff must then establish that his work environment was both subjectively and objectively hostile. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In other words, the work environment must be one a reasonable person in the plaintiff's position would find hostile or abusive and one which the plaintiff did perceive to be hostile or abusive. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786–87, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Oncale*, 523 U.S. at 81, 118 S.Ct. 998; *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1454 (7th Cir.1994).

But, "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Rather, "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the condition of [the victim's] employment' and create an abusive working environment." *Id.* (alteration in original). Whether such an environment exists is a question of law. *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir.1999).

Furthermore, "while employers are vicariously liable for hostile environment sexual harassment by supervisors (subject to certain defenses), a plaintiff must show negligence in order to hold an employer liable for co-worker harassment." *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir.1998) (internal citations omitted); *see also Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354–55 (7th Cir.2002) (stating that, to establish a prima facie case of hostile environment sexual harassment, a plaintiff must demonstrate that there is a basis for employer liability); *Fuller v. Caterpillar, Inc.*, 124 F.Supp.2d 610, 615–17 (N.D.Ill.2000) (discussing employer liability for hostile environment sexual harassment).[5]

### 1. Same-sex sexual harassment

 Although courts have uniformly held that Title VII does not protect employees from discrimination based upon sexual orientation,[6] *see, e.g., Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 704 & 707 (7th Cir.2000) ("harassment based solely upon a person's sexual preference or orientation (and not on one's sex) is not an unlawful employment practice under Title VII"); *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1084 (7th Cir.1984) (collecting cases), the United States Supreme Court has concluded that same-sex discrimination in the workplace is actionable under Title VII. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Accordingly, in a same-sex harassment case, the central issue "is whether members of one sex are exposed to disadvantageous terms or conditions of employment

---

5. The court assumes for purposes of this decision that liability exists on the part of Weyauwega because the parties, in their respective briefs, did not raise the issue of liability, did not discuss whether grounds for imputing liability to Weyauwega exist, and did not dispute the existence of Weyauwega's liability.

6. Congress has also made it clear that Title VII was not meant to prohibit discrimination based upon sexual orientation and has refused to adopt legislation that would extend the scope of Title VII to cover sexual orientation. *See* Employment Non–Discrimination Act of 1996, S.2056, 104th Cong. (1996); Employment Non–Discrimination Act of 1994, H.R. 4636, 103d Cong. (1994).

to which members of the other sex are not exposed." *Id.* at 80, 118 S.Ct. 998 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Proof that the harassment was motivated by sexual desire is, therefore, unnecessary to create an inference of sex discrimination; rather, the plaintiff must simply show that the harassment was motivated by his gender. *Oncale,* 523 U.S. at 80, 118 S.Ct. 998.

In *Oncale,* the Supreme Court set forth several ways in which a plaintiff can make a showing of same-sex harassment. *Id.* at 80–81, 118 S.Ct. 998. Those examples were likely meant to be illustrative rather than exhaustive. *See Shepherd v. Slater Steels Corp.,* 168 F.3d 998, 1009 (7th Cir. 1999) ("we discern nothing in the Supreme Court's *Oncale* decision indicating that the examples it provided were meant to be exhaustive rather than instructive"). To make a showing of same-sex harassment a plaintiff can first offer credible evidence that the harasser was actually motivated by sexual desire toward members of his own gender. *Jones v. Pacific Rail Servs.,* 2001 WL 127645, at *1 (N.D.Ill.2001) (citing *Oncale,* 523 U.S. at 80–81, 118 S.Ct. 998). Second, a plaintiff can offer proof of gender-specific statements from which an inference can be drawn that "the harasser is motivated by general hostility to the presence of members of the same sex in the workplace." *Id.* Third, a plaintiff can offer comparative evidence showing differences in how the harasser treated members of both sexes in the workplace. *Id.*

In addition to using the methods set forth in *Oncale,* a plaintiff can prove same-sex sexual harassment by establishing that the harassment was based upon perceived non-conformance with gender-based stereotypes. *Id.* at *2. The Supreme Court first identified the theory of sexual stereotyping in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), *overruled in part and on different grounds by* Civil Rights Act of 1991, where the court held that Title VII protects employees from sexual stereotyping by employers. Hopkins, the plaintiff in *Price Waterhouse,* was denied partnership in an accounting firm because she was considered too aggressive and described as "macho," in need of "a course at charm school," "a lady using foul language," and someone who was "a tough-talking somewhat masculine hard-nosed manager." *Price Waterhouse,* 490 U.S. at 235, 109 S.Ct. 1775. Hopkins was advised that she could improve her chances of partnership in the future if she would lose her masculine demeanor and instead "walk more femininely, talk more femininely, dress more femininely, wear makeup, have her hair styled, and wear jewelry." *Id.* at 235, 109 S.Ct. 1775. The Court held that "in the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Id.* at 250, 109 S.Ct. 1775. In so doing, however, the Court advised that

[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision. In making this showing, stereotyped remarks can certainly be evidence that gender played a part.

*Id.* at 251, 109 S.Ct. 1775.

As the Seventh Circuit further explained in *Doe v. City of Belleville,* 119 F.3d 563 (7th Cir.1997), *vacated and remanded by* 523 U.S. 1001, 118 S.Ct. 1183, 140 L.Ed.2d 313 (1998), "Title VII does not permit an employee to be treated adversely because his or her appearance or conduct does not conform to stereotypical gender roles." 119 F.3d at 580. Thus, in the context of a

claim of same-sex sexual harassment, the court found that "[a] man who is harassed because his voice is soft, his physique is slight, his hair long, or because in some other respect he exhibits his masculinity in a way that does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of' his sex." *Id.* at 581.[7]

Aside from the court in *Doe*, a number of courts, while recognizing that a plaintiff can proceed upon a theory of gender stereotyping, held that, because the plaintiff had not clearly or explicitly plead the theory or had not properly presented the theory to the lower court, the court would not consider the merits of the argument. *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252 (1st Cir.1999) (refusing to reach the merits of the plaintiff's claim of impermissible stereotyping because he presented evidence of coworkers mocking his effeminate characteristics to the district court only as an example of discrimination because of sexual orientation and because the plaintiff did not mention gender stereotyping in the district court and did not present any considered argumentation along that line); *Simonton v. Runyon*, 232 F.3d 33 (2d Cir.2000) (declining to reach the merits of the plaintiff's argument that the harassment he endured was based on his failure to conform to gender norms, regardless of his sexual orientation, because the plaintiff failed to plead sufficient facts for the court to consider of the issue); *Bibby v. Philadelphia Coca Cola Bottling Co.*, 2001 WL 919976 (3d Cir.2001) (holding that the plaintiff did not claim he was harassed because he failed to comply with societal stereotypes of how men ought to

appear or behave but instead alleged that he was discriminated against because of his sexual orientation); *Hamner v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 224 F.3d 701 (7th Cir.2000) (finding plaintiff waived argument because he did not make gender stereotyping allegation in district court but further finding that the gender stereotyping argument has no merit). Additionally, over the past several years, the theory of gender stereotyping has been advanced (without great success), in several Seventh Circuit cases other than *Doe* involving same-sex sexual harassment. *E.g., Spearman v. Ford Motor Co.*, 231 F.3d 1080 (7th Cir.2000); *Jones v. Pacific Rail Servs.*, 2001 WL 127645 (N.D.Ill. Feb.14, 2001); *EEOC v. Trugreen Ltd. P'ship*, 122 F.Supp.2d 986 (W.D.Wis.1999).

Recently, and in contrast with the majority of cases in the Seventh Circuit, plaintiffs in courts outside of the Seventh Circuit have met with greater success in advancing a theory of gender stereotyping to support their claims of sexual harassment. *See, e.g. Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864 (9th Cir.2001) (finding that harassment of plaintiff Sanchez occurred because of his sex when Sanchez presented evidence of sexual stereotyping including his co-workers' verbal abuse of him because of his feminine mannerisms and his co-workers' references to him as "she" and "her"); *Heller v. Columbia Edgewater Country Club*, 195 F.Supp.2d 1212 (D.Or.2002) (holding that a jury could find that the plaintiff was harassed because she did not conform to stereotypes of how a woman ought to behave when the plaintiff was attracted to

---

7. At least one court has found that *Oncale* neither precludes a plaintiff alleging same-sex discrimination from advancing a theory that the discrimination was based upon perceived non-conformance with gender-based stereotypes nor invalidates the court's decision in *Doe* regarding the issue of sexual stereotyp-

ing. *See Jones v. Pacific Rail Servs.*, 2001 WL 127645 at *2 (N.D.Ill. Feb.14, 2001) ("We see nothing in *Oncale*, or in the Court's decision to vacate and remand *Doe* for reconsideration in light of *Oncale*, to indicate that the Seventh Circuit's second rationale is no longer viable.").

and dated women, was ridiculed for wearing shoes that a co-worker called "faggy" because he believed them to be men's shoes, and endured comments and questions like "I thought you were the man," "I thought you wore the pants," and "Who wears the dick in the relationship?"); *Centola v. Potter*, 183 F.Supp.2d 403 (D.Mass. 2002) (finding sufficient evidence to support the plaintiff's claim that coworkers punished him because they perceived him to be impermissibly feminine for a man, stating that the "gender stereotype at work here is that 'real' men should date women, and not other men," and suggesting that "a plaintiff who is perceived by his harassers as stereotypically masculine in every way except for his actual or perceived sexual orientation could maintain a Title VII cause of action alleging sexual harassment because of his sex due to his failure to conform with sexual stereotypes about what 'real' men do or don't do"); *see also Schmedding v. Tnemec Co.*, 187 F.3d 862 (8th Cir.1999) (holding that the heterosexual plaintiff stated a claim of gender stereotyping even though his use of the phrase "perceived sexual preference" was confusing and agreeing that the phrase indicates that the harassment included rumors that falsely labeled the plaintiff as a homosexual in an effort to debase his masculinity and not that the plaintiff was harassed because he is a homosexual or perceived as being a homosexual); *but see Bianchi v. City of Philadelphia*, 183 F.Supp.2d 726, 736–37 (E.D.Pa.2002) (finding that the plaintiff stated a claim of harassment on the basis of sexual orientation, and not an "offensive stereotype" claim, when he failed to point to any specific characteristic, trait, or behavior which would indicate he was somehow unmanly or perceived to be so and when he did not cite to any particular comments, actions, or other evidence in the record supporting his contention that the root of the harassment was that he acted or was perceived to have acted inappropriately for a male); *Ianetta v. Putnam Invs., Inc.*, 183 F.Supp.2d 415 (D.Mass.2002) (holding that the plaintiff did not produce sufficient evidence that he was harassed because of his sex even though he advanced a theory of sexual stereotyping and suggesting that the conduct alleged was motivated by the plaintiff's sexual orientation).

### 2. Did the harassment alleged by Hamm occur "because of" sex?

Because Hamm does not offer any evidence that the harassment he alleges was motivated by sexual desire or by general hostility to the presence of males in the workplace and produces no comparative evidence as to how his alleged harassers treated members of both sexes in the workplace, Hamm proceeds on a theory of gender-based stereotyping to support his claim of hostile environment harassment. Despite the success of the plaintiffs in *Doe* and the recent success of the plaintiffs in *Nichols*, *Heller* and *Centola* in advancing a theory of gender stereotyping to establish a claim of same-sex harassment, the current precedent set by Seventh Circuit case law and the facts presented by Hamm dictate that this court find that Hamm has not established that he was harassed "because of" his sex.

The court recognizes, however, that the law governing same-sex sexual harassment is in its infancy and continues to evolve. And the court is sensitive to the fact that, in cases such as the one presented to the court by Hamm, the line between discrimination on the basis of sex and discrimination on the basis of actual or perceived sexual orientation is not always a clear one. In particular, this case presents novel questions of law because it involves a plaintiff who has clearly and concisely set forth a claim for hostile environment sexual harassment because of sexual stereotyp-

ing, who has attempted to support that claim with a fairly extensive factual record, and who has consistently stated at his workplace and in sworn documents that he is heterosexual. Nonetheless, the court finds that Hamm can not show that he was harassed "because of" his sex.

Because the facts of this case are important in distinguishing it from other cases which survived summary judgment, the court will closely examine the allegations set forth by Hamm in his complaint, proposed findings of fact, and brief in opposition to the defendant's motion for summary judgment. In these submissions, Hamm alleges that Bohringer and Kivisto were his principal harassers but also refers to several incidents involving other coworkers.

### a. Incidents involving Bohringer and Kivisto

Hamm sets forth a litany of complaints about both Bohringer's and Kivisto's treatment of him. Hamm first alleges that Bohringer refers to Hamm as a "kid" and was annoyed with Hamm's "high pitched voice." (Pl.'s Br. at 5.) It is true that Bohringer referred to Hamm as "kid" during his deposition (Bohringer Dep. at 16, 19, 26–27, 32), but there is no evidence that the label "kid" was in any way related to Hamm's gender (rather than his age, maturity level, or experience at Weyauwega) or that Bohringer ever referred Hamm as "kid" at Weyauwega. Additionally, Hamm takes Bohringer's reference to Hamm's "high pitched voice" out of context. During the course of Bohringer's deposition, when explaining the sequence of events that occurred during a dispute with Hamm, Bohringer stated, referring to Hamm, "Yeah, he started screaming, he got this real high pitched voice and can do some pretty good screaming and that made me even madder." (Bohringer Dep. at 16.) Hamm has not produced any evidence that Bohringer, or anyone else, ever

commented on Hamm's voice or teased Hamm about his voice during the course of events alleged as the basis for Hamm's claim of a hostile work environment. Rather, Bohringer's statement described what occurred during an argument with Hamm and Bohringer gave no indication during such statement that he was either "annoyed" by Hamm's "high pitched voice" or that he disapproved of his "high pitched voice."

Next, Hamm alleges generally that Bohringer threatened to "put him in a wheel chair" and "snap his neck" on a number of occasions and specifically that Bohringer threw a chemical barrel across the room at Hamm and, on another occasion, rushed at Hamm, yelling "Get off that forklift motherfucker. You stupid motherfucker." To begin with, Hamm has produced no evidence that these incidents were anything more than altercations with Bohringer over work issues. Assuming Bohringer did threaten to put Hamm in a wheel chair or to snap his neck, Hamm has failed to show that those threats were made because of his sex rather than because of Bohringer's belief that Hamm did a "crappy job" at work or because of Bohringer's general dislike for Hamm.

With regard to the other two incidents referenced by Hamm, the undisputed evidence shows that Bohringer felt that Hamm did a poor job at work and failed to keep up with what Bohringer regarded as Hamm's job duties. The incident involving the chemical barrel occurred after Bohringer found that the barrels which were supposed to contain a cleaning agent were empty. Apparently Bohringer felt that it was Hamm's responsibility to replace empty barrels with full ones and, as a result, began to scream at Hamm and threatened to "kick [his] smelly ass." Hamm also alleges that Bohringer threw an empty

chemical barrel across the room at him.[8] Bohringer denies ever throwing the chemical barrel, but admits he gave one of the barrels "a little bit of a kick and it slid across the room ...." (Bohringer Dep. 15–16). Regardless of whether Bohringer threw or kicked the chemical barrel, Bohringer's behavior, though unpleasant and inappropriate for the workplace, was the result of a work-related dispute and not because of discrimination on the basis of Hamm's sex. Similarly, the incident during which Hamm alleges that Bohringer rushed at him yelling obscenities and telling him to get off of the forklift to which Bohringer was assigned was a work-related dispute. The court also notes that although Bohringer allegedly used the term "motherfucker" when referring to Hamm, sexually explicit remarks among male co-workers are often, and are here, "simply expressions of animosity or juvenile provocation." See *Johnson v. Hondo, Inc.*, 125 F.3d 408, 412 (7th Cir.1997).

Likewise, Hamm alleges that Kivisto told Hamm that he was going to take Hamm to Lake Michigan and Hamm was not going to come back since Hamm would be at the bottom of the lake. This incident took place almost five years before Hamm's deposition in 1999 and before Zietlow ever began working for Weyauwega. (*See* Hamm Dep. at 20.) Hamm has produced no evidence that this threat was made because of his sex, or even because of his perceived homosexuality. Also, the evidence shows that Kivisto had threatened many other employees at Weyauwega with being beaten up. (Roemer Dep. at 11.) Based upon this evidence, no rational jury could conclude that Kivisto's threat, if made, was because of Hamm's gender.

Hamm also claims that Bohringer frequently referred to him as "girl scout." The evidence shows that the term "girl scout" allegedly used by Bohringer is not related to sex. Bohringer denies that ever using the term in reference to Hamm but admits that he has used the term toward others: "It's not sexual related, it's a term I use, say I come to work and somebody's got a problem, something's going wrong, everybody is standing around, and I just say come on, Girl Scouts, let's take care of it. And, you know, we take care of it, we keep on going. It's a term I use when somebody is whining or bawling about something, but I do not remember ever calling Mike Hamm that." (Bohringer Dep. 30–31.) Additionally, as Weyauwega points out in its response brief, Stearns testified that Bohringer uses the term "little girl scout" once in a while and that Bohringer has "probably even called me that." (Stearns Dep. at 29.) Because of the evidence before the court about the meaning of the term "girl scout," and because Hamm presents no evidence that the term "girl scout" in any way resulted from gender stereotyping (by citing to comments or actions indicating that Bohringer called Hamm a "girl scout" because Bohringer felt that Hamm acted inappropriately for a male) or even from Bohringer's alleged perception of Hamm's homosexuality, the court must conclude that the term "girl scout," even if directed at Hamm, was not done so because of his sex.

Hamm contends that Bohringer frequently referred to him using the terms "fag," "faggot," "queer," "homosexual," "fairy," and "homo." Hamm also alleges that Bohringer told him, referring to Zietlow, to "stop butt fucking [his] bisexual buddy." Further, Hamm claims that Kivisto told Hamm to "bend over" and "suck him off" and that Kivisto told co-workers he was going to force Hamm to give him a blow job. Hamm also alleges that Kivisto

---

8. In one handwritten complaint, marked Deposition Exhibit 18, Hamm alleges only that Bohringer threw the empty barrel across the room.

threatened him with a lead pipe and said "keep that fairy away from me down here," claiming that Hamm was "looking at [his] nuts and ass." Kivisto also told other employees not to bend over in front of Hamm, not to pick money up off the floor in front of Hamm and to watch what they said about Hamm. Additionally, Kivisto also referred to Hamm using the terms "queer," "fag," and "fairy."

■ Kivisto's and Bohringer's behavior described in the previous paragraph, on its face, relates to their belief that Hamm is a homosexual. And, as previously discussed, the Seventh Circuit recognized in *Doe v. City of Belleville*, 119 F.3d 563 (1997), that "[t]he courts have widely agreed that discrimination based on sexual orientation (actual or *perceived*), as opposed to sex, is beyond the purview of Title VII." 199 F.3d at 592 (emphasis added). The *Doe* court also found, however, that, based upon the facts presented to the court, the harassment of the plaintiff, H. Doe, was not based solely upon H. Doe's perceived sexual orientation, but instead also occurred because of H. Doe's sex. The court stated that there was "an unmistakably homophobic aspect to the harassment inflicted on H., exemplified by the use of epithets like 'fag' and 'queer,' and the suggestion that he should 'go back to San Francisco.' But this certainly does not establish, as a matter of law, that H. was being discriminated against solely on the basis of his perceived sexual orientation, as opposed to his sex." *Id.* at 592–93. Moreover, the court found that "juxtaposed alongside of the homophobic epithets... are other remarks that implicate sex rather than sexual orientation-the references to H. as "bitch" and Dawe's "bitch," for example, and the inquiries professing confusion as to whether H. was a 'girl or a guy.'" *Id.* at 593.

■ Similarly, the district court, in *Spearman v. Ford Motor Co.*, 1999 WL 754568 (N.D.Ill.1999), held that the plaintiff had presented evidence sufficient to create an inference that he was discriminated against because of his sex by relying upon a theory of gender stereotyping. Specifically, the court found that the plaintiff "appears to have been singled out because of the way he projected his gender, or how his gender was perceived by his co-workers. Co-workers speculated on [the plaintiff's] sexual orientation based upon their perception of him as a man, and not on any comment by [the plaintiff] himself of his sexual orientation." *Id.* at *6.

This rationale, however, was overturned by the Seventh Circuit Court of Appeals. In particular, the Court of Appeals found that the plaintiff's claim of sexual harassment due to a hostile environment failed because the plaintiff was not harassed because of his sex. *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1087 (7th Cir.2000). Citing to *Price Waterhouse*, the court emphasized that remarks based upon sexual stereotypes do not inevitably proved that gender played a part in a particular employment decision. *Id.* at 1085. Instead, the court found that it must "consider any sexually explicit language or stereotypical statements within the context of all of the evidence of harassment in the case, and then determine whether the evidence as a whole creates a reasonable inference that the plaintiff was discriminated against because of his sex." *Id.* The court went on to examine the particular facts of the case, finding that the record demonstrated that the plaintiff's "problems resulted from his altercations with co-workers over work issues, and because of his apparent homosexuality."[9] *Id.* Regarding the issue of

---

**9.** The plaintiff, Edison Spearman, testified at his deposition that he is a homosexual but claims he never revealed his sexual orientation to anyone at work. *Spearman,* 231 F.3d at 1082 & 1082 n. 1.

Spearman's apparent homosexuality the court stated the following:

> The record also shows that Spearman's co-workers maligned him because of his apparent homosexuality and not because of his sex. The testimonies of Curtis and Neeley clearly demonstrate that Spearman's harassers were motivated by their suspicion of Spearman's sexual orientation and his perceived desire for some sort of physical intimacy with them.... Moreover, Spearman's co-workers directed stereotypical statements at him to express their hostility to his perceived homosexuality, and not to harass him because he is a man. Curtis called him a "bitch" which, according to Gibson, means a "woman" or a "faggot." And the graffiti that specifically state that Spearman is "gay," a "fag," and compared him to a drag queen confirms that some of his co-workers were hostile to his sexual orientation, and not to his sex.

*Id.* at 1085–86 (internal citation omitted).

Hamm argues that *Spearman* is distinguishable, and *Doe* persuasive, because Hamm, like H. Doe, states that he is a heterosexual while Spearman admitted in his deposition that he is a homosexual. Specifically, Hamm claims that Hamm's heterosexuality is relevant to the reasonableness of his claim of gender stereotyping.[10] (Pl.'s Br. at 21.) Hamm states:

> When a homosexual is harassed and the basis offered for the harassment is a "perception of homosexuality," it is not difficult to conclude, as courts have, that the harassment resulted solely from homosexuality, not gender.... However, when a heterosexual is harassed and the basis offered for the harassment is a "perception of homosexuality," then it is likely and reasonable to infer that gender stereotyping is present and is the real basis for the harassment.

(Pl.'s Br. at 21.)

Hamm goes on to speculate that "[s]ince homosexuals have had their gender stereotyping claims dismissed due to a 'perception of homosexuality' and H. Doe., who was heterosexual, succeeded on his gender stereotyping claim, it would appear that the sexual orientation of the victim plays a factor in determining the 'reasonableness' of the claim." (Pl's Br. at 21 n. 10.)

Yet courts have never focused on the sexuality of the parties involved when determining whether sexual harassment occurred. *See Johnson v. Hondo*, 125 F.3d 408, 415 (7th Cir.1997) ("In the different sex situation, we do not ask a slew of subjective and invasive questions about the sexual orientation of the perpetrator *or the victim*. We ask whether the treatment meted out created a hostile work environment because the victim was singled out because of his or her gender....") (emphasis added). Moreover, the court in *Doe* never suggested that H. Doe's claim could succeed simply because he was heterosexual. Rather, the *Doe* court, though it focused its discussion on the sexual orientation of the harasser, was concerned with the difficulties of sorting out facts regarding a person's sexual orientation. *Doe*, 119 F.3d at 589.

Above all, Hamm's attempts to link his coworkers' accusations of homosexuality with some perception that Hamm was not "manly" is too attenuated to meet his bur-

---

**10.** In a footnote, Hamm draws attention to the fact that the court in *Spearman* used the phrase "apparent homosexuality." He cites to the dictionary definition of "apparent" to distinguish it from "perceived," suggesting that Weyauwega's arguments here are una-
vailing. Aside from the court's unwillingness to argue about semantics, the court points out that the *Spearman* court also used the phrase "perceived homosexuality," as cited on page twenty-seven of this decision.

den of showing that the harassment occurred because of his sex. To be sure, as Hamm indicates in his brief, a "perception of homosexuality" does not *necessarily* negate a plaintiff's gender stereotyping claim. (*See* Pl.'s Br. at 20.) But a plaintiff must also present evidence that he was harassed because he was a man and not only because he was perceived to be a homosexual. And in *Doe, Nichols,* and even *Price Waterhouse* there was additional evidence that we do not have here which led to the conclusion that the harassment was gender-based, at least in part. *Accord Bianchi v. City of Philadelphia,* 183 F.Supp.2d 726, 737 (E.D.Pa.2002) ("In *Price Waterhouse, City of Belleville,* and *Nichols* the gender stereotyping was more explicit. In those cases there were direct comments made concerning the plaintiff's gender, rather than the plaintiff's sexuality.") In particular, this case does not present us with both evidence of "homophobic epithets" *and* other remarks that implicate sex; rather, the evidence clearly shows that Bohringer's and Kivisto's remarks were based upon their dislike of Hamm's perceived sexual orientation.

In *Doe,* the plaintiff's gender was consistently questioned, he was ridiculed for wearing an earring, he was referred to as a "bitch," he was threatened with sexual assault, and his testicles were grabbed to determine if he was a male or a female. *Doe,* 119 F.3d at 568, 576–77. Likewise, the plaintiff in *Nichols* was attacked for walking and carrying his tray "like a woman" (for having feminine mannerisms), was mocked for not having sexual intercourse with a waitress who was his friend, was referred to as "she" and "her," and experienced vulgar name-calling cased in female terms. *Nichols v. Azteca Rest. Enters., Inc.,* 256 F.3d 864, 874 (9th Cir.2001). And finally, the plaintiff in *Price Waterhouse* was described as "macho" and masculine and advised to look, act, and dress more femininely. *Price Waterhouse v.*

*Hopkins,* 490 U.S. 228, 235, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

In his brief, Hamm concludes that
[i]t is likely and reasonable to infer that the harassers first perceived that he [Hamm] did not meet male stereotypes, and it was only from this failure to meet male stereotypes that they perceived he was homosexual. The harassment thus originated from his failure to meet male stereotypes, not his perceived homosexuality.... In addition, a reasonable person could easily infer that the references to sexual orientation were in themselves a direct attack on Hamm as a male.
(Pl.'s Br. at 20.)

Notwithstanding this argument, Hamm does not provide evidence concerning what male stereotypes he failed to meet and does not cite to any particular comments, actions, or other evidence (other than Bohringer's comment about his high pitched voice which was taken out of context and possibly the term "girl scout" used by Bohringer which Hamm failed to link to a gender stereotype) that his coworkers thought he behaved inappropriately for a man. Like the plaintiff in *Spearman,* Hamm was harassed not because of any of his characteristics, traits or mannerisms were feminine but because Hamm's coworkers, in particular Bohringer and Kivisto, were hostile to Hamm's perceived homosexuality and were wary of what they perceived to be Hamm's desire of physical intimacy with them. Although Hamm would like the court to make the same inference that the district court in *Spearman* made, namely that coworkers speculated about the plaintiff's sexual orientation because of their perception of him as a man, that rationale was clearly abrogated by the Seventh Circuit Court of Appeals. Thus, this court must conclude that Hamm was not harassed because he was a man, but rather because of his perceived homosexuality.

### b. Incidents involving other co-workers

In addition, Hamm alleges that behavior by other coworkers also contributed to creating a hostile work environment. First, he alleges that coworkers dropped brooms and brushes around him, telling each other not to bend over in front of Hamm. Second, Hamm alleges that Rick Hanstad pretended to hand out "butt plugs" to employees standing around Hamm. Third, Frank Young threatened to "shove the water hose up [Hamm's] ass." Hamm also alleges that Mike Fisher attempted to break machinery and blamed it on Hamm. Additionally, someone vandalized Hamm's truck in the Weyauwega parking lot and allegedly wrote "faggot" on Hamm's locker.

All of the incidents cited by Hamm as harassment contributing to a hostile work environment in relation to coworkers' treatment of Hamm involve either work-related conflicts or hostility from Hamm coworkers as a result of Hamm's perceived sexual orientation. For instance, the incident during which Frank Young threatened to "shove the water hose up [Hamm's] ass" was not harassment on the basis of sex; rather, it was a dispute over horseplay at work. Several employees, including Hamm himself stated during their depositions or through affidavits that Weyauwega employees sprayed each other with hoses daily as part of the substantial horseplay that went on at Weyauwega (see Hamm Dep. at 176–77, Joe Hamm Aff. ¶ 14.) [11] There is no evidence that Young's comment was in any way related to Hamm's sex or even sexual in nature. Instead the evidence shows that his comments were made in an effort not to get soaked by the water hose.

Additionally, allegations that Mike Fischer attempted to break machinery in order to blame the problems on Hamm involves work related disputes or Fischer's dislike of Hamm; the evidence illustrates neither discrimination on the basis of sex nor discrimination due to perceived sexual orientation. The other incidents, including coworkers dropping brushes and brooms and warning each other not to bend over around Hamm, Hanstad handing out "butt plugs" to employees standing near Hamm, and the graffiti allegedly displaying the word "faggot" on Hamm's locker are all related to Hamm's perceived sexual orientation. Therefore, as previously discussed, these incidents do not involve discrimination based on sex.

Overall, while the court finds the behavior of employees at Weyauwega toward Hamm to be, at a minimum, sophomoric, and, at worst, reprehensible, Title VII is not meant to be a "general civility code" for the workplace. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201; *Shepherd v.*

---

11. Hamm, when question about whether he was ever involved in the pranks or horseplay that took place at Weyauwega stated "[n]ot any more than what the norm was at work." (Hamm Dep. at 262.) This "norm," however, seemingly involved frequent horseplay and pranks both during work hours and during break time. For example, Hamm himself testified that during free time, more specifically "every evening and every day," employees spray each other with water hoses (Hamm Dep. at 176); that someone stuck a bed in the women's locker room as a prank (Hamm Dep. at 177); that Weyauwega employees went into a coworkers' locker and "labeled his Vaseline jack-off jelly" (Hamm Dep. at 178); and that Bohringer would frequently wrestle/engage in physical horseplay with coworkers during work time (Hamm Dep. at 179–80). Hamm's brother, Joe Hamm, confirmed that horseplay takes place at Weyauwega, including employees spraying each other with water hoses daily and throwing cheese curds at each other numerous times each day. (Joe Hamm Aff. ¶ 14.)

*Slater Steels Corp.*, 168 F.3d 998, 1002 (7th Cir.1999). Additionally, although the court also believes that the above-described behavior of employees involved in horseplay and altercations over work-related issues was no doubt unpleasant and inappropriate, Title VII does not protect employees from such unpleasantness. *See Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995) (stating that the concept of sexual harassment is not designed to purge the workplace of vulgarity). Thus, because Hamm has not established that he was harassed because of his sex, his hostile environment claim must fail.[12]

## C. Retaliation claim

Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Hamm alleges that Weyauwega retaliated against him for filing complaints of sexual harassment with Weyauwega and the Wisconsin Equal Rights Division ("ERD").

The Seventh Circuit recently clarified the two methods available for analyzing retaliation claims in the summary judgment context. Under the first method, the plaintiff presents direct evidence that "he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir.2002). Even so, "mere

temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Id.* Under the second method, the plaintiff presents indirect evidence of the employer's retaliatory intent using the familiar burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Id.; see also Hilt–Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir.2002). The plaintiff must show that "after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner." *Stone*, 281 F.3d at 644. Once the plaintiff presents a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 643–44. Once the employer has articulated such a reason, the burden of production shifts back to the plaintiff to demonstrate that the proffered reason for the adverse employment action is pretextual. *Id.* If the employee cannot establish pretext, his retaliation claim cannot survive summary judgment. *Id.*

At the time the parties filed their briefs in this case, the Seventh Circuit had not yet issued its decision in *Stone*. Thus, the parties' briefs contain arguments about whether there is evidence of a causal connection between a protected activity and any adverse action, which is no longer part of the prima facie case under the indirect method of proof. *See Stone*, 281 F.3d at 643. But, as the *Stone* court explained, evidence of a causal link between the plain-

---

12. Because the court has determined that no reasonable trier of fact could find that the harassment alleged by Hamm was motivated by his gender, the court need not discuss whether the harassment alleged by Hamm was severe or pervasive. Indeed, Weyauwega chose not to present any argument on this issue in its opening brief and gave only cursory treatment to the issue of whether the harassment was severe or pervasive in its reply brief.

tiff's protected expression and any adverse employment action is direct evidence of retaliation. *Smith v. Allstate Ins. Co.,* 2002 WL 485374, No. 99 C 0906, at *17 (N.D.Ill. Mar. 29, 2002) (citing *Stone,* 281 F.3d at 643). "Accordingly, the Court will analyze the parties' causal-link arguments under the direct evidence method and the parties' other arguments under the *McDonnell Douglas* framework." *Id.*

### 1. Direct evidence

Hamm argues that there is a casual connection between his protected activity and his alleged suspension and termination by Weyauwega. The only direct evidence offered by Hamm in support of his claim for retaliation, however, is the temporal proximity between that activity and the termination of his employment.

Hamm filed his first complaint with the Wisconsin ERD on September 3, 1998. Additionally, Hamm filed complaints with Weyauwega on March 24, 1999, May 25, 1999, and June 7, 1999. Finally, Hamm filed two additional ERD complaints in June of 1999 and on July 9, 1999. Hamm alleges that adverse action, specifically a suspension and termination, occurred somewhere between June 14, 1999 when Weyauwega offered Hamm a severance package and July 7, 1999 when Weyauwega sent Hamm a letter stating that they would regard him as a quit as of July 1, 1999 unless he accepted the terms of a new severance agreement. (Pl.'s Br. at 31.) Hamm claims that, at the very least, he was suspended on June 14, 1999. (*See* Pl.'s Br. at 31.)

The filing of Hamm's first ERD complaint occurred nine months before Hamm alleges Weyauwega took any adverse action against him. That nine month lapse of time between Hamm's first ERD complaint and the adverse action against Hamm is too great, in and of itself, to create an inference of retaliation. *See,*

*e.g., Sauzek v. Exxon Coal USA, Inc.,* 202 F.3d 913, 919 (7th Cir.2000) (three month lapse); *Filipovic v. K & R Express Sys., Inc.,* 176 F.3d 390, 399 (7th Cir.1999) (four month lapse); *Parkins v. Civil Constructors of Illinois, Inc.,* 163 F.3d 1027, 1039 (7th Cir.1998) (three month lapse); *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir.1998) (five month lapse).

Beyond the fact that Hamm's alleged suspension and termination took place after he filed a charge of discrimination, Hamm alleges that discussion about his first complaint to the ERD continued in October during a "coerced meeting" with management and then from November 1998 through June 1999 among other employees. Hamm, however, provides no evidence either that management coerced his participation in the October meeting or that employees continued to discuss his first ERD complaint. Therefore, Hamm cannot show a causal relationship between the filing of his first ERD complaint and his alleged suspension and termination. *See Oest v. Illinois Dep't of Corr.,* 240 F.3d 605, 616 (7th Cir.2001) ("The inference of causation weakens as the time between the protected expression and the adverse action increases, and then additional proof of a causal nexus is necessary.")

That leaves Hamm's second ERD complaint, filed in June of 1999, Hamm's third ERD complaint, filed on July 9, 1999, and Hamm's complaints to Weyauwega on March 24, 1999, May 25, 1999, and June 7, 1999. Because Weyauwega did not receive notice of Hamm's second ERD complaint until after the end of June 1999, Hamm's second ERD complaint is only relevant to the extent that any adverse action took place, not on June 14, 1999, but after June 30, 1999. *See, e.g., Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1147 (7th Cir. 1997) (holding that a plaintiff's retaliation claim fails when the employer is unaware of the employee's protected activity prior

to the employee's termination); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir.1994) (stating that there can be no causal link between protected activity and an adverse employment action if the employer remained unaware of the protected activity). Similarly, because Hamm filed his third ERD complaint on July 9, 1999 and the only adverse action of which he complains occurred in June or early July of 1999, the filing of that complaint with the ERD is not relevant to the issue of retaliation.

Even assuming that the timing of the filing of Hamm's second ERD complaint and Hamm's complaints to Weyauwega in relation to Hamm's alleged suspension and termination is suspicious, Hamm must still produce evidence which ties the adverse action to his protected activity. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir.2000) ("Speculation based on suspicious timing alone, however, does not support a reasonable inference of retaliation; instead, plaintiffs must produce facts which somehow tie the adverse decision to the plaintiff's protected actions. The mere fact that one event preceded another does nothing to prove that the first event caused the second.") (internal citations omitted). As previously stated, even though timing can be an important factor to consider when deciding whether an adverse employment action is retaliatory, *see Oest*, 240 F.3d at 616; *Sweeney v. West*, 149 F.3d 550, 557 (7th Cir.1998), "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir.2002) (collecting cases).

Apart from suspicious timing, Hamm has failed to set forth evidence that establishes a causal link between his complaints and the termination of his employment. Accordingly, the court concludes that Hamm has failed to present direct evidence of retaliation sufficient to preclude Weyauwega's motion for summary judgment.

"Direct evidence, however, frequently does not exist in these cases. As such, most employees attempt to satisfy their burden through the indirect method of proof." *Hilt–Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir.2002).

### 2. Indirect evidence

To present a prima facie case of retaliation in violation of Title VII using indirect methodology, an employee must show the following: (1) that he engaged in a statutorily protected activity; (2) that he performed his job according to his employer's legitimate expectations; (3) that, despite meeting his employer's legitimate expectations, he suffered a materially adverse employment action; and (4) that he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Hilt–Dyson*, 282 F.3d at 465. "Absent direct evidence of retaliation, failure to satisfy any element of the prima facie case proves fatal to the employee's retaliation claim." *Id.*

Assuming, without deciding, that Hamm can establish that he engaged in a statutorily protected activity by filing complaints with Weyauwega and the ERD and that he suffered an adverse employment action by being suspended and then terminated,[13] Hamm nevertheless has failed to

---

13. The parties dispute, and there are material issues of fact regarding, whether Hamm engaged in a protected activity and whether Hamm suffered an adverse employment action.

present a prima facie case of retaliation. In reaching this conclusion, the court focuses upon Hamm's failure to establish prongs two and four of the prima facie case of retaliation.

To establish prong two, Hamm must show that he was performing his job satisfactorily, meaning that he was meeting the legitimate expectations of his employer. Hamm cannot establish this element. There is ample undisputed evidence in the record that Hamm was involved in horseplay during work at Weyauwega, that he failed to properly do his job at Weyauwega because he spent too much time talking to his coworkers, that he was involved in numerous altercations with his coworkers, and that he was regarded as being an instigator of problems at the plant and as having a knack for making things go wrong. Nowhere does Hamm claim that he was meeting the legitimate expectations of Weyauwega.

Moreover, Hamm has failed to establish prong four of the prima facie case of retaliation because he provides no evidence that he was treated less favorably than any similarly situated employee who did not engage in statutorily protected activity. Employees are similarly situated when there is substantial similarity between them with respect to their performance, qualifications, and conduct. *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617 (7th Cir.2000). Hamm has identified no similarly situated person who did not file complaints with Weyauwega and the ERD who was treated more favorably than Hamm.

Even if Hamm could establish a prima facie case, including a showing that he suffered an adverse action by being terminated, Weyauwega has come forward with legitimate, nondiscriminatory reasons for not scheduling Hamm to return to work. In addition to the reasons set forth during the court's discussion, *supra*, of Hamm's job performance, the undisputed evidence shows that Weyauwega received feedback from employees that there were fewer disruptions in the workplace and greater morale amongst the workers when Hamm was absent. Hamm has done nothing to show that these reasons are pretext for retaliation.

## IV. CONCLUSION

In conclusion, and for all of the foregoing reasons,

**IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the United States District Court Clerk enter final judgment accordingly.